1999 SD 155

Kenneth J. KOCER and, Rhonda A. Kocer, Plaintiffs and Appellees,

v.

BON HOMME COUNTY COMMISSIONERS, acting in their capacity as Bon Homme County Board of Equalization, Defendants and Appellants.

Kathy Kocer and Robert Kocer, Plaintiffs and Appellees,

v.

Bon Homme County Commissioners, acting in their capacity as Bon Homme County Board of Equalization, Defendants and Appellants.

Nos. 20875, 20876.

Supreme Court of South Dakota.

Considered on Briefs Oct. 21, 1999.

Decided Dec. 15, 1999.

John P. Blackurn of Blackburn, Stevens & Fox, Yankton, South Dakota, Attorneys for plaintiffs and appellees.

Lisa Z. Rothschadl, Bon Homme County State's Attorney, Tyndall, South Dakota, Attorney for defendants and appellants.

AMUNDSON, Justice.

[¶1.] Bon Homme County Commissioners (Commissioners) appeal the trial court's reversal of its 1997 tax assessment of Kenneth and Rhonda, Robert and Kathy Kocer's (Kocers) real property. We affirm.

## FACTS

[¶2.] Kocers collectively own nine parcels of agricultural land, approximately 533 acres, in Bon Homme County, South Dakota (County).[1] In preparation for the 1997 tax assessment, the Director of Equalization (Director) had the entire county reassessed. County hired Arvid Meland (Meland), a soil expert, to analyze the county property. Meland testified at trial that this "county-wide analysis" took only two days to complete. After Meland's analysis, County reassessed the county property. County's overall assessment of the county decreased by approximately 6%. However, Kocers' property valuations increased on each of the nine parcels at a range of 37% to 87%, for an average increase of 48%.

[¶3.] The Kocer property has many physical aspects that reduces its usability as farmland. The previous director had made valuation adjustments based upon the factors present on Kocers' property. However, the present Director testified that she used a computer to calculate the assessment based exclusively upon the soil survey manual and sales data. In fact, Director stated that to complete a mass appraisal, she never has to leave her office because all she needs is the computer and records to assess the fair market value of the property.

[¶4.] In conducting an assessment, the Director considers the cost, market, and income approaches. In addition, she utilizes the additional guidelines under SDCL 10-6-33.1 to consider the capacity of the land to produce and the location, size, soil, terrain, and topographical condition of property by relying on comparable sales of agricultural property.

[¶5.] Director began her assessment of Kocers' property by first considering the capacity of the Kocers' land to produce. A soil survey, which provided analysis of soil types and yield data for each soil type, was used to determine the Kocer property's capacity to produce. In addition to the soil survey, Director also took the advice of Meland in making an adjustment for a gravel pit located on Kocers' property.[2] This was the only gravel pit adjustment made despite the presence of numerous gravel pits on the property. In addition to the one gravel pit adjustment, Director also made a downward adjustment for two creeks on Kocers' property.

[¶6.] After utilizing the soil survey, Director gathered information of comparable sales of agricultural land with similar characteristics to Kocers' property. Despite the initial thirty-four comparable sales compiled by Director, she found that only seven were comparable to Kocers' property. The comparable sales ranged from $405.00 to $650.00; Kocers' property was assessed by Director at an average price of $527.00 per acre.

[¶7.] After determining comparable sales, the Director used the market approach to develop the "top dollar" of the property. Director found that the "top dollar" of Kocers' property was $700.00. Director then took the soil type rating, multiplied it times the $700.00 "top dollar," and finally, multiplied that number by the number of acres to arrive at the full and true value of Kocers' property.

1. In 1996 Kocers sought to have their 1995 assessed property values lowered. When the Commissioners refused, Kocers brought suit in circuit court. The trial court concluded that Kocers' property values had been assessed in excess of its true and full value. The assessed valuations were deemed void and the trial court declared the proper valuation to be used by Commissioners. The Commissioners did not appeal.

2. Following this advice, the director adjusted the soil type rating for the gravel pit by reducing it from .518 to .311 for the 26.5 acres of gravel pit.

[¶ 8.] Kocers, believing that their property had been assessed excessively high, sought a reassessment from the Board.[3] After being denied a change in valuation by the Board, Kocers appealed the Board's decision to circuit court.

[¶ 9.] Director's testimony indicates that she was unaware of and failed to make any adjustment for drains, drainage, drainage problems, or flooding. Further, Director testified that she was not aware that there were "at least four culverts" and "one bridge" on the Kocer property. She relied solely on the soil survey and the market; a market comprised of thirty-four sales, of which, only one contained a creek on the property.

[¶ 10.] Further evidence was presented at trial through the testimony of the county's soil expert, Meland, that a soil survey is not a "perfect tool" and only provides a basis for an assessment. He also stated there were limitations to the tool; it does not take into consideration land features, such as potholes or gravel pits, which limit soil productivity. Finally, he noted that from previous experience you cannot take the soil survey book and plug in the values listed into the computer to receive a correct value assessment.

[¶ 11.] Kocers provided expert testimony of a land appraisal from appellee Robert Kocer (Robert). The trial court found Robert to be a qualified land appraiser whose opinions were supported by sufficient, credible evidence. In addition, the court found that any inherent bias of Robert's appraisal was overcome by his evidence. Robert's testimony provided an appraised value of Kocers' 533.09 acres to be $324 per acre, as opposed to the approximate value of $526 per acre as assessed by Commissioners.

[¶ 12.] At the conclusion of trial, the court disagreed with the valuation method used by the Director. The court found that the valuation method used did not adequately take into consideration the physical features on Kocers' property which limit its productivity. The court found that Commissioners failed to use comparable sales considerations, failed to consider the actual ability of Kocers' land to produce, failed to consider the soil, terrain and topographical conditions of the property, and failed to make adjustments for: sandy soil, gravel, gravel pits, creeks, water run off, flooding, drainage problems, weed and disease problems brought by flooding, unproductive and low productive land, willow trees, six culverts running water onto the Kocer property, and two creeks of sufficient size that they are covered by bridges. In addition, the court noted in its findings that 45% of Kocers' property is not tillable due to gravel pits, sand, creeks, rocks, and steep terrain subject to the damaging effects of water and wind erosion. The court, in finding the assessment figures excessive, declared new assessment figures for the Kocer property.[4]

---

3. The specific assessment increases of Kocers' property from 1996 to 1997 were as follows:

| Parcel | Acres | 1996 Value | 1997 Value | Percent Increase |
|---|---|---|---|---|
| 1 | 118.5 | $29,625 | $55,392 | +87% |
| 2 | 37.5 | $13,125 | $20,808 | +59% |
| 3 | 39.5 | $15,800 | $22,806 | +44% |
| 4 | 39.5 | $16,590 | $22,792 | +37% |
| 5 | 38.72 | $11,616 | $17,951 | +55% |
| 6 | 39.5 | $16,590 | $22,792 | +37% |
| 7 | 82.38 | $34,600 | $47,358 | +37% |
| 8 | 99.99 | $24,997 | $49,471 | +41% |
| 9 | 37.5 | $15,750 | $21,565 | +37% |

4. The trial court's assessed valuation changes were as follows, compared to the *approximate valuations* by Commissioners and Robert Kocer:

| Parcel | Acres | Commissioner Value | Robert's Value | Court Value |
|---|---|---|---|---|
| 1 | 118.5 | $467 | $220 | $250 |
| 2 | 37.5 | $555 | $290 | $350 |
| 3 | 39.5 | $577 | $350 | $400 |
| 4 | 39.5 | $577 | $400 | $420 |
| 5 | 38.72 | $464 | $220 | $300 |
| 6 | 39.5 | $577 | $400 | $420 |
| 7 | 82.38 | $575 | $400 | $420 |
| 8 | 99.99 | $485 | $340 | $350 |
| 9 | 37.5 | $575 | $400 | $420 |

[¶ 13.] The Commissioners appeal, raising the following issues:

1. Whether the Director correctly followed SDCL 10–6–33.1 in determining the full and true value of the plaintiff's property.

2. Whether Kocers met their burden of proof to overcome the presumption that the Director's valuations are correct?

## STANDARD OF REVIEW

[¶ 14.] Our standard of review in assessment matters is well settled. We have often stated:

"This court's proper scope of review of a trial court's decision in a trial de novo of an assessment matter is whether the decision of the trial court was 'clearly erroneous.' When applying the clearly erroneous standard, the question is not whether this court would have made the same findings that the trial court did, but whether on the entire evidence this court is left with a definite and firm conviction that a mistake has been committed."

*Amert v. Lake County Bd. of Equalization*, 1998 SD 66, ¶ 14, 580 N.W.2d 616, 618 (quoting *Richter Enterprises, Inc. v. Sully County*, 1997 SD 61, ¶ 7, 563 N.W.2d 841, 843 (quoting *Hutchinson County v. Fischer*, 393 N.W.2d 778, 781 (S.D.1986) (citations omitted))). Additionally, it is presumed that "tax officials act in accordance with the law and not arbitrary or unfairly when assessing property." *Id.* at 618–19 (citing *Richter*, 1997 SD 61, ¶ 7, 563 N.W.2d at 843 (citing *Lincoln Township v. South Dakota Bd. of Equalization*, 1996 SD 13, ¶ 5, 543 N.W.2d 256, 257; *Hutchinson County*, 393 N.W.2d at 782)). A " '[t]axpayer also has the burden of overcoming the presumption that Director's value was correct' by producing 'sufficient evidence to show the assessed valuation was in excess of true and full value, lacked uniformity in the same class or was dis-

criminatory.' " *Amert*, 1998 SD 66, ¶ 14, 580 N.W.2d at 619 (quoting *Richter*, 1997 SD 61, ¶ 7, 563 N.W.2d at 843 (citations omitted)). In addition to the taxpayer's heavy burden, " '[e]ven if the director of equalization fails to fully comply with statutory mandates, rendering the assessment void, a taxpayer cannot avail himself of such invalidity without also showing that the tax levied was unjust and inequitable.' " *H.A. Poindexter v. Hand County Bd. of Equalization*, 1997 SD 71, ¶ 12, 565 N.W.2d 86, 89–90 (quoting *Knodel v. Board of County Comm'rs*, 269 N.W.2d 386, 389 (S.D.1978) (citing *Brink v. Dann*, 33 S.D. 81, 144 N.W. 734 (1913))). " 'Substantial compliance with legislative directives is sufficient in determining assessed valuation.' " *Id.* at 90 (quoting *Knodel*, 269 N.W.2d at 389 (citing *Hot Springs v. Fall River Landowners*, 262 N.W.2d 33 (S.D.1978))).

## DECISION

[¶ 15.] **1. Whether the Director correctly followed SDCL 10–6–33.1 in determining the full and true value of the plaintiff's property.**

[¶ 16.] Under Article XI, Section 2, of the South Dakota Constitution, " '[t]axes shall be uniform on all property of the same class, . . . and the valuation of property for taxation purposes shall never exceed the actual value thereof.' " *Knodel*, 269 N.W.2d at 389. It also states under SDCL 10–6–33 that " '[a]ll property shall be assessed at its true and full value in money . . . .' " *Id.* In addition, SDCL 10–6–1(5) defines "true and full value" as " 'the usual cash selling price at the place where the property to which the term is applied shall be at the time of the assessment.' " *Id.* In determining the true and full value of agricultural land, SDCL 10–6–33.1 provides the following:

The true and full value in money of agricultural land, as defined by § 10–6–31, which has been in primarily agricul-

tural use for at least five successive years immediately preceding the tax year for which assessment is to be made shall be the market value as determined for each county through the use of all comparable sales of agricultural land based on consideration of the following factors:

(1) The capacity of the land to produce agricultural products as defined in § 10–6–33.2;

(2) The location, size, soil, terrain, and topographical condition of property including but not limited to capability, the land's use, climate, accessibility and surface obstructions which can be documented through an analysis of land selling prices[.]

SDCL 10–6–33.1 (1998).[5] *See also Roseland v. Faulk County Bd. of Equalization,* 474 N.W.2d 273, 274–75 (S.D.1991) (discussing SDCL 10–6–33.1). We have noted that "[n]otwithstanding the enumerated criteria of SDCL 10–6–33.1, 'the valuation of property for taxation purposes shall never exceed the actual value thereof.'" *Roseland,* 474 N.W.2d at 275 (quoting S.D.Const.Art. XI, § 2).

[¶ 17.] This Court, in addressing a property assessment in *Amert,* was faced with a situation where the assessor had 10,000 properties to appraise and did not have time to view the properties. 1998 SD 66, ¶ 19, 580 N.W.2d at 620. Amert's homes were older homes that had been converted into multi-unit rentals and had several problem areas that could be detected through physical inspection and would result in a change in the properties' valuation. *Id.,* ¶ 18, 580 N.W.2d at 620. We noted that "[u]nder the circumstances, we believe Amert has provided sufficient evidence as to the importance of viewing this unique property so as to overcome the presumption of correctness." *Id.,* ¶ 20, 580 N.W.2d at 620.

[¶ 18.] In *Poindexter,* we reviewed a tax assessment on cropland in Hand County, South Dakota. 1997 SD 71, ¶ 2, 565 N.W.2d at 87. Poindexter's property was affected by extreme topography of hills with drastic drops, high susceptibility to water erosion, and contained rocks covering most of the area. *Id.,* ¶¶ 3–4, 565 N.W.2d at 88. The Director testified that in formulating her assessment, she primarily relied upon soil maps and comparable sales. *Id.,* ¶ 9, 565 N.W.2d at 89. In *Poindexter,* Arvid Meland,[6] the expert witness for the Board of Equalization, testified that "using the soil maps for tax assessment purposes could be flawed because certain features were often omitted, such as stoniness, pot holes, drainage systems with channels, and slopes." *Id.,* ¶ 10, 565 N.W.2d at 89. However, unlike in the present case, the Director had testified that she made downward adjustments in her assessment for rocks, escarpments, and channels. In fact, Meland had been hired to conduct a rock survey to allow the county to adjust their assessments accordingly; Meland, however, made no recommendation for adjustments for rocks. *Id.,* ¶ 24, 565 N.W.2d at 92. In upholding the assessment, the court noted that Director had made adjustments for rocks and Poindexter offered no proof that the assessment was unfair. *Id.,* ¶ 26, 565 N.W.2d at 92. In order for a taxpayer to prevail, he must show "'that the tax levied was unjust and inequitable[;]'" this Poindexter failed to do. *Id.* (quoting *Knodel,* 269 N.W.2d at 389).

[¶ 19.] In *Roseland,* the County Assessor and a Department of Revenue representative conducted a field inspection of taxpayers' property, reviewed climatic data, and reexamined soil types. 474 N.W.2d at 274. Similarly, in *Knodel,* the land was also personally viewed by the Director of Equalization prior to assessing the value of

---

5. SDCL 10–6–33.1 was amended in 1998 to include under subdivision (2) the inserted language of "location, size" immediately preceding "soil."

6. This is the same Arvid Meland who is the expert witness in the present case.

each parcel of property. *Id. See Knodel,* 269 N.W.2d at 388. However, in the present case, the Director never left her office in calculating Kocers' assessment. Like *Amert,* a simple viewing of the "unique property" would show that this is not an ordinary parcel of land and it had many physical aspects which caused a decrease in value. While the Commissioners' argument is valid that they cannot view every parcel of land in the county, it is feasible to view "problem parcels of land." Kocers had previously appealed assessments on their property and Commissioners knew that assessing Kocers' property had encountered problems in the past.

■ [¶ 20.] As in *Poindexter,* Kocers' property has many physical aspects which decrease its value as farmland. However, unlike *Poindexter,* Director did not make adjustments for these problems. Unlike *Amert,* Kocers' adequately proved that, based upon the value reducing aspects on their land, their property is "unique property" with a history of tax assessment valuation problems and should have been viewed by the Director prior to assessment. Sufficient evidence was presented to the circuit court that physical aspects of the property existed on the property to affect its value and Director should have viewed the property before assessing. The trial court held that assessing this unique property without first viewing it created an "unjust and inequitable" tax levy on Kocers' property. In reviewing the record, Commissioners have failed to show that there is no support for the trial court's decision in this case.

[¶ 21.] **2. Whether Kocers met their burden of proof to overcome the presumption that the Director's valuations are correct?**

[¶ 22.] It is well settled that:

"The appealing [Taxpayers] bear the burden of overcoming the presumption that the director of equalization's valuation was correct. They must produce sufficient evidence to show the assessed valuation was in excess of true and full value, lacked uniformity in the same class or was discriminatory."

*Poindexter,* 1997 SD 71, ¶ 12, 565 N.W.2d at 89-90 (quoting *Knodel,* 269 N.W.2d at 389 (citing *Brink,* 33 S.D. 81, 144 N.W. 734)) (alterations in original). In *Amert,* we noted that Amert "provided sufficient evidence as to the importance of viewing [his] unique property so as to overcome the presumption of correctness." 1998 SD 66, ¶ 20, 580 N.W.2d at 620. In *In re Jepsen,* 76 S.D. 421, 425, 80 N.W.2d 76, 78 (1956), however, we held that the presumption of correctness did not apply when appraiser never viewed property and merely relied on an independent appraiser's assessment calculations.

■ [¶ 23.] In the present case, evidence was presented at trial to show that a plethora of physical factors existed on Kocers' property to affect the value of the property. The failure of Director to view this unique property, which was known by Commissioners through previous litigation to be a problem parcel of property, allowed Kocers to overcome the presumption of correctness. *See Amert,* 1998 SD 66, ¶ 20, 580 N.W.2d at 620; *Jepsen,* 76 S.D. at 425, 80 N.W.2d at 78. The trial court heard all witnesses, weighed their credibility, and made its own independent determination that Kocers overcame the presumption of correctness. This record does not show that a mistake has been made by the trial court.

[¶ 24.] We affirm.

[¶ 25.] MILLER, Chief Justice, SABERS, KONENKAMP, and GILBERTSON, Justices, concur.